## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JEFFREY M. BROWN, | CASE NO. 4:15-cv-00992-MWB-GBC |
| Plaintiff, | (JUDGE BRANN) |
| | (MAGISTRATE JUDGE COHN) |
| v. | |
| CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S APPEAL |
| Defendant. | Docs. 1, 10, 11, 14, 15, 18 |

## REPORT AND RECOMMENDATION

### I.   Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Defendant") denying the application of Jeffrey M. Brown ("Plaintiff") for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act") and Social Security Regulations, 20 C.F.R. §§404.1501 *et seq.*, §§416.901 *et. seq.*[1] (the "Regulations"). The Court recommends that Plaintiff's appeal be denied, and the decision of the Commissioner be affirmed, and the case closed.

---

[1] Part 404 governs DIB, Part 416 governs SSI. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Like *Sims*, these regulations "are, as relevant here, not materially different" and the Court "will therefore omit references to the latter regulations." *Id.*

## II.    Procedural Background

On October 5, 2011, Plaintiff applied for DIB and SSI. (Tr. 182-91). On April 3, 2012, the Bureau of Disability Determination ("state agency") denied Plaintiff's application (Tr. 111-38), and Plaintiff requested a hearing. (Tr. 148-49). On April 23, 2013, an ALJ held a hearing at which Plaintiff appeared and testified. (Tr. 89-98). On July 23, 2013, the ALJ held a second hearing at which Plaintiff— who was not represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 43-77).  On October 16, 2013, the ALJ found that Plaintiff was not entitled to benefits. (Tr. 24-42). Plaintiff requested review with the Appeals Council (Tr. 23), which the Appeals Council denied on March 20, 2015, affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-6). *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).

On May 21, 2015, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On July 24, 2015, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 10, 11). On October 21, 2015, Plaintiff filed a brief in support of the appeal ("Pl. Brief"). (Doc. 14). On November 20, 2015, Defendant filed a brief in response ("Def. Brief"). (Doc. 15). On December 17, 2015, Plaintiff filed a brief in reply ("Pl. Reply"). (Doc. 18). On January 11, 2016, the Court referred this case to the undersigned Magistrate Judge. The matter is now ripe for review.

### III.    Standard of Review and Sequential Evaluation Process

To receive benefits under the Act, a claimant must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B). The claimant bears the burden of production. *Id.* ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require").

The ALJ uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520. The ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment

prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520. Before step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that the claimant can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability under the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

The Court reviews the ALJ's decision under the deferential substantial evidence standard. *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003). Substantial evidence supports the ALJ decision unless no "reasonable mind might accept [the relevant evidence] as adequate to support a conclusion." *Id.* (internal citations omitted). "Stated differently, this standard is met if there is sufficient evidence 'to justify, if the trial were to a jury, a refusal to direct a verdict.'" *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)).

## IV.   Relevant Period

As the ALJ notes, Plaintiff's date last insured was June 30, 2006, and the record contains scant evidence of disability prior to the date last insured. (Tr. 32-35). Plaintiff did not address this claim in his briefs and cites minimal evidence prior to the date last insured. (Pl. Brief); (Pl. Reply). Plaintiff's brief indicates that Plaintiff has been disabled since "at least" October 5, 2011, and the procedural history mentions only SSI, not DIB. (Pl. Brief at 1-2).

Medical records establish that Plaintiff suffered from asthma prior to July 31, 2006, but did not indicate that a sedentary job would trigger work-preclusive asthma, that his musculoskeletal impairments would limit his ability to perform sedentary work, or that he suffered from work-related mental limitations. (Tr. 275-370, 653-77). Plaintiff was hospitalized for three days in 2001 at St. Catherine's hospital for cough, shortness of breath, and wheezing, but does not mention musculoskeletal or psychiatric complaints and was not taking any psychiatric or opiate medications on admission. (Tr. 279). Examination indicated no musculoskeletal or mental impairments. (Tr. 310-11). Plaintiff reported no drug or alcohol use. (Tr. 313). The state agency requested that St. Catherine's provide any records from 2000, 2001, and 2006, but only this hospitalization was provided. (Tr. 277).

In April of 2001, Plaintiff was taking medications for respiratory impairments, but no psychiatric or pain medications. (Tr. 368). During a pulmonary function study in 2004, Plaintiff "stopped due to complaints of gagging and inability to remain on the mouthpiece" but the test revealed no explanation for his shortness of breath, and there was a "normal cardiac and pulmonary response to exercise." (Tr. 362). His physicians opined that, although Plaintiff could not continue working as a roofer, he could pursue "alternative employment." (Tr. 339). Although Plaintiff remained covered by workers' compensation for medical care through 2007, there is no evidence of medical treatment from April of 2004 to May of 2008, when he was already incarcerated in New York. Doc. 11.

With regard to DIB, Plaintiff has failed to meet his burden of production, and substantial evidence supports the ALJ's determination with regard to DIB.. Consequently, the relevant period begins on October 5, 2011, the date he applied for SSI. However, the Court considered the records prior to October 5, 2011, to the extent they were probative of Plaintiff's disability after October 5, 2011.

## V.    Relevant Facts in the Record

The administrative transcript in this case is 735 pages. Doc. 11. Plaintiff initially alleged disability onset in December, 2000, when he was thirty-one years old. (Tr. 224). He remained classified by the Regulations as a younger individual

through the date of the ALJ decision. (Tr. 35); 20 C.F.R. § 404.1563. Plaintiff worked as a roofer through 2000. (Tr. 165-71).

Plaintiff received partial workers compensation benefits in the amount of $64,085.58 from December 22, 2000 through April of 2004. (Tr. 165-71). Plaintiff had been exposed to toxic chemicals as a roofer and was found to have industrial asthma. (Tr.173). A decision dated January 27, 2004 found that Plaintiff had a permanent partial disability. (Tr. 173). Plaintiff's physicians advised him to find an alternative career, and not return to roofing. (Tr. 175). In January of 2007, Plaintiff agreed to settle his workers compensation claim for $120,413.28 for injuries to his eyes and face and industrial asthma. (Tr. 173). Plaintiff was then incarcerated from 2007 through December 19, 2009. (Tr. 97). Plaintiff earned $6,135.00 working as a roofer on Staten Island in 2010. (Tr. 202, 211).

In May of 2008, while incarcerated, Plaintiff underwent an examination that indicated normal gait, speech, and spine. (Tr. 654). Plaintiff reported alcohol and narcotic use through 2007, including IV and crack cocaine. (Tr. 653). Plaintiff reported that he had been diagnosed with bipolar disorder in 1999. (Tr. 653). Plaintiff was taking medications for respiratory, but not musculoskeletal or mental impairments. (Tr. 653).In August of 2008, liver biopsy indicated abnormalities and testing indicated Hepatitis C. (Tr. 658, 673). In October of 2008, lumbar spine MRI indicated anterolisthesis, spondylolysis, disc degeneration, and disc bulges

with no stenosis. (Tr. 660).  In February of 2009, Plaintiff reported abdominal pain, and imaging of Plaintiff's abdomen indicated no significant abnormalities. (Tr. 657). In March of 2009, Plaintiff reported a "two day history of cough," and chest X-ray indicated no acute disease. (Tr. 656). By February of 2009, Plaintiff was taking lithium, and testing revealed that his lithium levels were low. (Tr. 675, 677).

The only medical records after Plaintiff was released from incarceration in 2009 and before he applied for benefits in October of 2011 are from September of 2010, when Plaintiff was transported to Staten Island University Hospital after being found intoxicated on a sidewalk. (Tr. 380). Plaintiff was "verbal but not making sense." (Tr. 380). Plaintiff smelled of alcohol but could not provide the amount he drank. (Tr. 380). He admitted drinking beer that day. (Tr. 416). Plaintiff later indicated that he had consumed six "Four Loco" beers that day. (Tr. 437). Plaintiff was insured. (Tr. 454).   He indicated that he continued using "crack/cocaine daily." (Tr. 441). Plaintiff's diagnoses included acute alcohol intoxication, continuing alcohol dependence and continuing cocaine dependence. (Tr. 384, 397). Plaintiff denied decreased hygiene but reported impaired impulse control. (Tr. 385). Plaintiff was taking lithium, Celexa, Buspar, and Thorazine for bipolar disorder. (Tr. 386). Plaintiff reported that he was supposed to be on Depakote for seizures but could not afford it. (Tr. 386). He denied muscle pain, joint pain, back pain, hallucinations, and depression. (Tr. 386, 418). He had fallen

secondary to intoxication and reported pain as a result of the fall. (Tr. 424). Plaintiff's blood alcohol level was 148 mg/dL. (Tr. 391). Plaintiff "desire[d]" detoxification. (Tr. 392). He denied previous psychiatric hospitalizations. (Tr. 428).

Plaintiff underwent detoxification and was hospitalized for five days. (Tr. 384). Plaintiff "participated in group and counseling activities, remained in stable condition, and was discharged." (Tr. 408). Plaintiff wanted to participate in a 28 day rehabilitation program. (Tr. 443). Arrangements were made for a program to pick Plaintiff up from the hospital. (Tr. 448). He indicated that his current "leisure interests" were "roofing-work," and that he spent his free time "drinking daily." (Tr. 430). He indicated that he was unemployed but "able" to work, had missed days at work due to alcohol use, and specifically stated that he was unemployed and had lost his roofing job due to alcohol use. (Tr. 431).

In October of 2011, he applied for benefits under the Act. (Tr. 182). Plaintiff reported that he had lost his job as a roofer in 2010 because of his asthma and back pain. (Tr. 218). Plaintiff does not mention alcohol use as contributing to losing his job. (Tr. 218). He was living with his parents, who were in their seventies, in Pennsylvania. (Tr. 193). He spoke with a state agency employee over the phone, who noted no problems hearing, reading, breathing, understanding, coherency, concentrating, talking, or answering. (Tr. 225).

On November 9, 2011, Plaintiff completed a Function Report. (Tr. 242). He reported that he had no side effects from his medications, which included lithium, thorazine, Effexor, buspar, albuterol, theopylinne, and prednisone. (Tr. 242). He reported problems with lifting, squatting, bending, standing, reaching, walking, kneeling talking, climbing stairs, memory, completing tasks, concentrating, and following instructions. (Tr. 240). He reported that he had transferred custody of his children to his ex-mother-in-law because he could not care for them, could walk for 100 feet before needing to rest, and could pay attention for "30 seconds." (Tr. 240). He reported no problems getting along with authority figures or co-workers, but could not handle stress and did not like change. (Tr. 240). He reported using a cane and that he had suffered a compound fracture the year before that left his right leg two inches shorter than his left. (Tr. 241). He reported that he watched television and read, but that he had a hard time concentrating to read. (Tr. 239). He reported that he would leave the home, but one of his parents had to accompany him. (Tr. 239). He reported performing some household chores, but that his parents did most of them. (Tr. 236-39). He indicated that had problems maintaining hygiene due to his mental impairments. (Tr. 236). He reported problems sleeping and using a nebulizer four times per day. (Tr. 236). He reported constant pain in his lungs, back, and legs. (Tr. 244). He indicated that he was taking ibuprofen for

pain and that he had gained significant weight since the onset of disability. (Tr. 244). Plaintiff indicated that he did not have insurance. (Tr. 254).

On December 7, 2011, Plaintiff underwent a consultative examination with state agency physician Dr. Sethuraman Muthiah, M.D. (Tr. 546-53). Dr. Muthiah opined that Plaintiff could sit, stand, or walk for no more than a combined five-hours in an eight-hour workday. (Tr. 546). Plaintiff reported shortness of breath "on exertion" and back pain. (Tr. 551). Examination indicated "few scattered rhonchi" in his lungs, his right leg was shorter than his left, tenderness and muscle spasm in his spine, and antalgic gait, although he could stand and walk without a cane. (Tr. 553).

On January 9, 2012, Plaintiff established care at Monroe County Family Health Center with Dr. Theodore Kowalyshyn, M.D. (Tr. 582). Plaintiff had insurance through a Medical Access Card. (Tr. 582). Examination indicated a tibial deformity in Plaintiff's right leg secondary to an injury in 2010 and occasional wheezes. (Tr. 582). Examination was otherwise normal. (Tr. 582). Plaintiff reported a history of asthma, bipolar disorder, and chronic back pain related to a motor vehicle accident in October of 2010. (Tr. 582). Dr. Kowalyshyn prescribed Advair, Albuterol, and theophylline for asthma, lithium, Buspar, Effexor, and Thorazine for bipolar disorder, and balcofen and Percocet for back pain. (Tr. 583). Dr. Kowalyshyn referred Plaintiff to a psychiatrist and an orthopedist. (Tr. 582-

83). On February 20, 2012, Plaintiff followed-up and requested a nebulizer. (Tr. 585). Examination was normal aside for "scattered" wheezes. (Tr. 585). Dr. Kowalyshyn again referred Plaintiff to an orthopedist. (Tr. 585).

On January 23, 2012, Plaintiff presented to the ReDCo Group for a psychosocial evaluation. (Tr. 641). Plaintiff reported that he was bipolar and had been "manic" for several days. (Tr. 641). Plaintiff denied ever using intravenous drugs or any drug other than alcohol. (Tr. 642). He "denied any drug use." (Tr. 642). Plaintiff explained that he had gone to prison for DUI after drinking alcohol. (Tr. 643). Plaintiff reported receiving cash assistance and food stamps, living with his parents, and that he enjoyed painting. (Tr. 643). Plaintiff reported "that he has friends and neighbors that he talks with as well as his family." (Tr. 644). Mental status examination indicated that Plaintiff did not have impaired hygiene, inappropriate clothing, anger, hostility, abnormal movements, inappropriate affect or mood, increased lability, euphoria, elation, or irritability. (Tr. 645). Plaintiff had slightly slumped posture and slight restlessness and occasional anxiety, depression, blunted affect, and insomnia. (Tr. 645). Plaintiff had no reported hallucinations and no impaired attention span, concentration, intelligence, orientation, judgment, memory, thought content, delusions, suicidal ideation, or stream of thought. (Tr. 646). Providers diagnosed Plaintiff with bipolar disorder and assessed a GAF of 60. (Tr. 647).

The next day, January 24, 2012, Plaintiff presented for a consultative examination with state agency psychologist Dr. Dustan Barabas, Psy.D. (Tr. 574). Plaintiff reported that he had been diagnosed with bipolar disorder in 2007. (Tr. 575). Plaintiff reported a learning disability, difficulty acquiring information, and mood swings. (Tr. 575). Dr. Barabas wrote:

> The claimant presented as cooperative, alert, and calm during the evaluation. His posture and behavior were unremarkable. The claimant appeared slightly overweight. His speech was relevant, coherent, and organized. The claimant reported a history of psychological problems requiring treatment. The claimant reports that he saw a psychiatrist while in prison and several psychologists throughout his adult life. The claimant could not recall a specific name or date. The claimant went for an intake at Redco Group at Stroudsburg yesterday. The claimant's affect appeared normal. He denied hallucinations or delusions. No phobias were reported. The claimant admits to a remote history of substance abuse. He reports a history of using cocaine, alcohol, marijuana and crack; he said he last used in year 2000. The claimant reports a history of six psychiatric hospitalizations…

(Tr. 575-76). Mental status examination indicated:

> The claimant appeared to be in the average range of intelligence, but his formal IQ data was unavailable at the time of this assessment. The claimant's abstracting abilities were adequate and his thinking was organized. The claimant had some difficulty recalling specific dates and times of significant events; however, his long-term appeared within normal limits. The claimant was able to spell the word "world" backwards without error or hesitation. The claimant was able to recall a string of five numbers during a numeric memory test. immediately and " could recall the same string of five numbers after a few minutes. The claimant's short-term memory appeared within normal limits. In general, the claimant's attention and focus appear unimpaired. The claimant was oriented to person, place and time. The claimant's sleep is reported as restless and poor. However, no obsessive thoughts or

> compulsive behaviors were observed or reported. At this time, suicidal ideation, plan or intent to harm himself were denied. The claimant appears low risk for self-harm at this time.

(Tr. 576). Dr. Barabas assessed Plaintiff to have a GAF of 70 and no more than slight limitations in any area of work-related function. (Tr. 571-72, 577).

On March 12, 2012, the state agency sent ReDCo a request for medical records, and also asked whether ReDCo would be willing to complete an evaluation for Plaintiff's disability claim. (Tr. 555-58). ReDCo submitted medical records, but did not respond to whether they would be willing to complete an evaluation. (Tr. 555-60).

On March 19, 2012, Dr. David Hutz, M.D., reviewed Plaintiff's file, including Dr. Muthiah's opinion, and authored a medical opinion. (Tr. 117-24). Dr. Hutz explained that Dr. Muthiah's opinion was based "heavily on the subjective report of symptoms and limitations provided by the individual," was unsupported by "the totality of the evidence," and was "an overestimate of the severity of [Plaintiff's] restrictions/limitations and based only on a snapshot of the individual's functioning." (Tr. 124). Dr. Hutz also noted that Plaintiff's Function Report indicated that he had no problem with personal care, could take out light trash, and could walk up to 100 feet. (Tr. 117). Dr. Hutz opined that Plaintiff could perform a range of light work. (Tr. 117-24).

On April 19, 2012, Plaintiff presented at ReDCo for a psychiatric evaluation. (Tr. 638). Plaintiff reported six previous DUIs, a history of bipolar disorder and alcohol dependence, sleep problems, and anxiety. (Tr. 638). Plaintiff's medications on admission were Effexor, Lithium, Buspar, and Thorazine. (Tr. 638). The psychiatrist observed that Plaintiff was well-dressed and groomed, anxious, and had a low mood, with no suicidal ideation. (Tr. 639). The psychiatrist diagnosed bipolar disorder and alcohol dependence, assessed a GAF of 58, discontinued thorazine and Buspar, and began Remeron. (Tr. 640).

On April 20, 2012 and May 18, 2012, Plaintiff followed-up with Dr. Kowalyshyn. (Tr. 607, 609). At each visit he had no objective abnormalities on physical examination and no wheezes. *Id*. Dr. Kowalyshyn prescribed oxycodone and Ambien. (Tr. 607). Dr. Kowalyshyn continued referring Plaintiff to orthopedists and pain management specialists. (Tr. 607, 609). On June 15, 2012, Plaintiff reported that the pain specialist was "too far to drive." (Tr. 605). Dr. Kowalyshyn observed "scattered" wheezes. (Tr. 605). On July 27, 2012, Plaintiff reported that he was "still working on orthopedic evaluation." (Tr. 603). Dr. Kowalyshyn observed "occasional" wheezes and prescribed nebulizer medication. (Tr. 603).

On June 7, 2012, Plaintiff followed-up at ReDCO with Dr. Muhamad Rifai, M.D. (Tr. 637). Plaintiff reported that he had doubled his Effexor dose on his own

and felt "good" and "improved" but was "not sleeping." (Tr. 637). Plaintiff denied suicidal ideation. (Tr. 637). Dr. Rifai continued Plaintiff's medications, instructed Plaintiff to call ReDCo if the medications caused adverse effects, and assessed a GAF of 55. (Tr. 637). On August 2, 2012, Plaintiff requested to substitute trazodone for Remeron because he continued to experience sleep problems. (Tr. 635). Plaintiff reported "improved mood but feels a higher dose of Effexor would help him." (Tr. 635). Dr. Rifai increased his Effexor, prescribed trazodone, and assessed a GAF of 55. (Tr. 635).

On September 11, 2012, Plaintiff presented to Nicole Schock, CRNP, at Dr. Kowalyshyn's referral, for evaluation of Hepatitis C. (Tr. 595). Abdominal ultrasound indicated chronic liver disease. (Tr. 596). Plaintiff denied abdominal pain, neck pain, leg pain, joint pain, swelling, anxiety, depression, decreased memory, fatigue, tiredness, and dizziness. (Tr. 594). Plaintiff reported using intravenous drugs through 2008 and that he had been contracted Hepatitis C while in prison in 2006. (Tr. 593). "Chest and lung exam reveal[ed] quiet, even and easy respiratory effort with no use of accessory muscles and on auscultation, normal breath sounds, no adventitious sounds and normal vocal resonance." (Tr. 594). Plaintiff's abdomen was non-tender. (Tr. 595). CRNP Schock indicated that Plaintiff would need psychiatric clearance before treating with interferon and Incivek. (Tr. 593).

On September 24, 2012, Plaintiff followed-up with Dr. Kowalyshyn. (Tr. 601). He was requesting narcotic pain medication, but Dr. Kowalyshyn indicated "that we do not do chronic pain management" and referred him to a pain management specialist. (Tr. 601). Examination indicated that Plaintiff was "pleasant" and had normal physical findings, with no wheezes. (Tr. 601). The state agency asked if Dr. Kowalyshyn would be willing to complete an evaluation in connection with Plaintiff's claim for benefits, and Dr. Kowalyshyn responded "no." (Tr. 580).

On October 11, 2012, Plaintiff followed-up with Dr. Rifai. (Tr. 634). Plaintiff reported that he was "ready" for Hepatitis C treatment and felt "improved mood with higher dose of Effexor." (Tr. 634). Dr. Rifai substituted Doxepin for trazodone, continued his other medications, instructed Plaintiff to call ReDCo if he suffered any adverse medication side effects, and assessed a GAF of 55. (Tr. 634).

On October 22, 2012, Plaintiff presented to the emergency room after an allegedly accidental overdose on Ambien and baclofen. (Tr. 693). When questioned regarding alcohol use, providers noted that "he states he has no drank alcohol in six years; however, review of alcohol level from 3/26/11 was noted to be 346." (Tr. 693). Reports from family members also indicated more recent alcohol use. (Tr. 693). Providers also noted that "his responses to questions are somewhat vague at times and inconsistent." (Tr. 693). Plaintiff reported fatigue, shortness of

breath, wheezing, and depression. (Tr. 694). Plaintiff denied weight change, abdominal pain, arthritis, joint swelling, and hallucinations. (Tr. 694). Examination indicated wheezing and limited insight. (Tr. 694). Plaintiff was hospitalized through at least October 24, 2012. (Tr. 694).

On November 13, 2012, Plaintiff followed-up at Pocono Gastroenterology for treatment of Hepatitis C. (Tr. 697). Plaintiff "report[ed] IV drug use," specifically heroin and cocaine. (Tr. 697). Plaintiff reported that his last drink of alcohol was in 2006. (Tr. 697). Plaintiff denied fatigue, shortness of breath, wheezing, abdominal pain, back pain, joint pain, swollen joints, muscle pain, confusion, depression, and memory loss. (Tr. 698). Examination indicated normal respiration, with no wheezes, intact motor strength, and intact neurological function. (Tr. 698).

On December 20, 2012, Plaintiff followed-up with Dr. Rifai. (Tr. 726). Plaintiff reported that he had been hospitalized in October of 2012 "for Lithium toxicity due to confusion about his medications." (Tr. 726). Plaintiff reported that he continued to feel ready for Hepatitis C treatment and was experiencing improved mood. (Tr. 726). Dr. Rifai continued Plaintiff's medications, instructed him to contact ReDCo if he experienced any adverse medication side effects, and assessed a GAF of 55. (Tr. 726).

On December 29, 2012, Plaintiff established care with a new primary care physician, Dr. Ralph Hawkes, M.D. (Tr. 713). Plaintiff reported that he had been told he needed surgery for his back, but had declined. (Tr. 712). Examination indicated that Plaintiff walked with a cane, but was otherwise normal, with no wheezes. (Tr. 712). Plaintiff refused to put on a gown, so examination was "limited." (Tr. 712). Plaintiff denied alcohol use and reported that his last drug use was cocaine on December 21, 2007. (Tr. 712).  Dr. Hawkes continued Plaintiff's medications, including his Percocet, but noted "need to obtain old record. Told him I will fill this medication for now but he needs to be transition to a pain management specialist." (Tr. 713). This record does not indicate why Plaintiff discontinued care with Dr. Kowalyshyn. (Tr. 712-14).

On February 7, 2013, Plaintiff followed-up with Dr. Rifai and reported concern about his father, who had lung cancer, was waiting for Hepatitis C treatment, was sleeping "OK," and was worried about weight gain. (Tr. 723). On examination Plaintiff was cooperative, had normal muscle strength, tone, gait, psychomotor activity, speech, mood, affect, thought process, attention span, concentration, memory, language, and fund of knowledge, and limited insight and judgment. (Tr. 724). Plaintiff denied hallucinations and suicidal ideation. (Tr. 724). Dr. Rifai opined that Plaintiff was "stable" and cleared for Hepatitis C treatment. (Tr. 725).

On March 11, 2013, Plaintiff presented to Dr. Hawkes. (Tr. 710). Dr.

Hawkes noted that:

> Patient showed up at the front window today stating that he needed to
> see me. He already had an appointment scheduled in two days. He
> states that his father will be coming home with hospice in the next few
> days and it will only be him and his mother to help his father.
> Therefore, he's going to cancel hi s appointment with orthopedics on
> the 18th. But he wants me to prescribe his pain medicine for his
> chronic back and neck pain.
>
> He states his asthma is doing okay but he wanted to have his
> prescriptions refilled.

(Tr. 710). Plaintiff was walking with a cane. (Tr. 710). Dr. Hawkes wrote, "[w]ill

refill the Percocet since his father will be home with hospice but I reinforced that

this is only going to be temporary. I am not going to manage his narcotics." (Tr.

711). On April 9, 2013, Dr. Hawkes wrote:

> [T]here is confusion regarding his insurance. He has the medical
> assistance product and, therefore, no specialist will take this,
> especially the pain doctors. It appears I will be stuck managing this
> for his back pain. Told patient he needs to follow the rules strictly. He
> takes his meds for his back.

(Tr. 708).

On March 6, 2013, the Social Security Administration sent Plaintiff a Notice

of Hearing that indicated he could have representation, along with an attached

handout on Plaintiff's right to free representation and a Receipt of Notice to

complete and return. (Tr. 100-08). Plaintiff completed the Receipt of Notice on

April 1, 2013, and returned it to the Social Security Administration. (Tr. 99).

On April 23, 2013, Plaintiff's treating gastroenterologists responded to a medical records request from the state agency. (Tr. 692). The gastroenterologists indicated that they would not be willing to perform an examination or test relating to Plaintiff's claim for disability. (Tr. 692).

On April 23, 2013, Plaintiff appeared and testified before an ALJ. (Tr. 89). Plaintiff indicated that he had retained an attorney but was "irritated" with him because the attorney had not performed any work on the case and was not present for the hearing. (Tr. 92). Plaintiff testified "I'm not even going to wait for him…so I'm going to tell him I'm going to go ahead with it." (Tr. 92). The following colloquy followed:

> ALJ: Let's talk about it for a second and then you can make a decision as to, I want to make sure you make a fully informed decision because it sounds like you're irritated with your attorney
>
> CLMT: Very irritated.
>
> ALJ: And I get that and I understand that. You obviously know you have that right of representation and you availed yourself to that and I can understand it's frustrating when this happens. With that being said you may find it helpful to have somebody here and represent you and I want you to think it through before you just proceed today and if you think you want to talk to this person or alternatively somebody else I can give you some time. It's not going to hurt your case at all for me to do that. I saw that you had asked for a continuance and my big concern was since I didn't have anything from this person I wanted to talk to you to let you know we didn't have anything.
>
> CLMT: I know.
>
> ALJ: And also to get an update on your medical records to see if there's additional information I need.

CLMT: There's a lot more information and I do have one paper I want to submit.

ALJ: Well, why don't we do this. Okay, I'll take that but what I'm also going to do is I'll get an update as to your care but why don't you, as opposed to just proceeding today why don't you take some extra time.

CLMT: That's what I'd like to do.

ALJ: That's fine. I don't have any issue with that at all and the only thing I'll ask you to do, I'll get an update from your care today. I'm going to have you just review this form and sign it. It's basically an acknowledgment that the next time we call your case you'll agree to proceed.

CLMT: Yeah.

ALJ: Okay, just so we can do it that way but before that let's cover and see what we need in terms of medical records, okay? I did provide you a disc today which I suggest you take with you.

CLMT: I don't know how to use a computer.

ALJ: That's okay. You can take it with you and the good part about that is when you go talk to whoever is going to represent you you can provide them that disc and they can review it to see what medical records are there…

(Tr. 92-93). The ALJ later explained, "[i]f you decide you want to get counsel the only suggestion I'll make to you is you go out today and I say today, go out real soon to look for somebody because you're going to find this hearing date is going to creep up on you again." (Tr. 96).

On June 11, 2013, the Social Security Administration sent Plaintiff a Notice of Hearing that indicated he could have representation, along with an attached

handout on Plaintiff's right to free representation and a Receipt of Notice to complete and return. (Tr. 78-86).

On July 23, 2013, Plaintiff appeared at a hearing before the ALJ. (Tr. 45). The ALJ stated, "the last time we talked we talked about your right of representation." (Tr. 45). Plaintiff explained that the attorney did not want to handle his case. (Tr. 45). The ALJ asked, "you understand your right of representation as I provided you before?" to which Plaintiff replied, "yes." (Tr. 46). Plaintiff testified to problems with personal care because it had been a bad week, he was in a depressive state, and his father had passed away four months ago. (Tr. 52). Plaintiff testified to constant pain in his back that he treated with Percocet and baclofen, along with problems breathing, a history of broken bones, and liver problems caused by Hepatitis C. (Tr. 52-58). He testified that his physical impairments caused problems lifting, carrying, standing, and sitting, and that these problems were exacerbated by his obesity. (Tr. 59-60). He testified to problems sleeping. (Tr. 60-61). He testified that he lived with his mother, who did most household chores, and used a cane. (Tr. 60-61). He testified to breathing difficulties with exertion and exposure to environmental irritants. (Tr. 62). Plaintiff testified that he had been clean and sober, with no alcohol consumption, since June of 2011. (Tr. 62). He testified that his swollen liver caused pain, and that he had passed a psychiatric clearance to pursue additional liver treatments. (Tr. 64). He

testified to an inpatient psychiatric hospitalization earlier that year, depression, and hallucinations. (Tr. 64-65). He testified that he did not have friends, but hoped his teenage children could come live with him. (Tr. 65-70).

On August 10, 2013, Plaintiff underwent a consultative psychiatric examination with Dr. Clova Walters, M.D. (Tr. 730). Dr. Walters noted Plaintiff subjective report of significant symptoms, including hallucinations, mood swings, anger, violence, depression, poor impulse control, racing thoughts, a history of suicidal attempts, paranoid ideation, and fear of his environment. (Tr. 731). Plaintiff reported that his hospitalization in Staten Island occurred after a suicide attempt by drinking motor oil. (Tr. 731). Plaintiff denied current alcohol or drug use and reported a history of cocaine and heroin use. (Tr. 731). Plaintiff exhibited distraction, poor attention, inattentiveness, depression, anxiety, and difficulty with serial sevens. (Tr. 732). Dr. Walters assessed marked mental health limitations. (Tr. 733). Plaintiff submitted a letter after receiving Dr. Walter's opinion, indicating that he had been hospitalized multiple times in the previous year and that Dr. Walter's mischaracterized his medications. (Tr. 267).

The ALJ found that Plaintiff had severe impairments of bipolar disorder, major depressive disorder, degenerative disc disease of the spine, history of alcohol dependence, hepatitis C, chronic pain syndrome, allergic rhinitis, and asthma. (Tr.

29). The ALJ found that Plaintiff did not meet a Listing. (Tr. 30). The ALJ found

that Plaintiff had to RFC to perform:

> [S]edentary work as defined in 20 CFR 404.1567(a) and 416.967(a).
> The claimant can do a limited range of sedentary work. He needs a
> sit/stand option every 15 minutes. The claimant can occasionally
> bend, balance, stoop, kneel, crouch, crawl and climb but he can never
> climb ladders, ropes or scaffolds. He is limited to simple, routine and
> repetitive work generally described as unskilled. The claimant can
> have no interaction with the public and only occasional interaction
> with coworkers and supervisors. The claimant must work in a low
> stress work environment described as no production, rate or pace
> requirements. He must avoid concentrated exposures to heat, cold
> humidity, dusts, odors and gases.

(Tr. 31). The ALJ found that Plaintiff had no past relevant work, but could perform

other work in the national economy. (Tr. 35-36).

## VI.   Plaintiff Allegations of Error

### A. ALJ's Duty to Develop the Record

Plaintiff asserts that the ALJ erred in failing to obtain inpatient psychiatric

records. (Pl. Reply at 1-4).   Plaintiff must demonstrate that this error caused

prejudice. "The question is not 'whether every question was asked which might

have been asked had [the claimant] been represented by an attorney, [but] whether

the record reveals evidentiary gaps which result in unfairness or clear prejudice.'"

*Jozefick v. Shalala*, 854 F. Supp. 342, 348 (M.D. Pa. 1994) (quoting *Edwards v.*

*Sullivan,* 937 F.2d 580, 585–86 (11th Cir.1991)); *see also* 28 U.S.C. § 2111

("[T]he court shall give judgment after an examination of the record without regard

to errors or defects which do not affect the substantial rights of the parties."); *Livingston v. Califano*, 614 F.2d 342, 345 (3d Cir. 1980) ("The fact that a claimant is unrepresented by counsel and has knowingly waived this right is not alone sufficient for remand. However, if it is clear that the lack of counsel prejudiced the claimant or that the administrative proceeding was marked by unfairness due to the lack of counsel, this is sufficient for remand, or reversal") (citing *Hess v. Secretary of HEW*, 497 F.2d 837, 840 n.4 (3d Cir. 1974)); *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979) ("When the claimant has been informed of his right to counsel before an administrative hearing and knowingly waives it, his lack of representation is not, of itself, cause for remand.. Lack of counsel is sufficient cause for remand only if supported by a showing of clear prejudice or unfairness at the administrative hearing") (citing *Domozik v. Cohen*, 413 F.2d 5, 9 (3d Cir. 1969)).

The Court cannot engage in meaningful judicial review of Plaintiff's claim that the ALJ erred in failing to obtain documentation if the Court cannot review the allegedly wrongfully omitted documentation. *See Herring v. Colvin,* No. 3:12–cv–2211–MWB (M.D.Pa. Sept. 29, 2014) (Adopting Report and Recommendation that claimant's appeal be denied where claimant alleged the ALJ should have obtained additional medical records, but did not proffer those records into evidence before the Appeals Council or Court). As in *Herring,* "Plaintiff may not need to proffer

new evidence. However, Plaintiff must proffer the evidence, inform the Court as to the content of that evidence, provide a new argument to the Court based on that evidence, or otherwise make a showing of prejudice." *Id.*

*Herring* also noted that "allowing a claimant to secure a remand for failing to develop the record without any showing of prejudice would allow a back door around the materiality requirement of a sentence six remand." *Id.* at 19. A sentence six remand requires that evidence be material. *Id.* (citing 42 U.S.C. §405(g)). Materiality requires "a reasonable possibility that the new evidence would have changed the outcome of the Secretary's determination." *Szubak v. Secretary of Health and Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984). *Herring* continued:

> Arguing that the ALJ failed to develop the record is akin to arguing that there should be additional evidence taken before the Commissioner of Social Security. Although an ALJ has a heightened duty to develop the record for unrepresented claimants, the ALJ still has a duty to develop the record for claimants who are represented by counsel. Thus, most claimants could simply reword a request for a sentence six remand into a request for remand based on failing to develop the record. If there was evidence that existed prior to the ALJ's decision, a claimant could argue that the ALJ failed to develop the record if the ALJ failed to take the requisite steps to obtain the evidence. If there was evidence that did not yet exist at the time of the ALJ's decision, a claimant could argue that the ALJ failed to develop the record if the ALJ failed to leave the record open after the hearing. If prejudice is not required for a remand for failure to develop the record, then framing these arguments as a failure to develop the record, rather than a sentence six remand for consideration of new evidence, would dispense with the materiality requirement for a sentence six remand.

> Third, requiring a judicial determination about the probability of prevailing would not preempt the Secretary's authority to make a determination in the first place. Judicial determinations about the probability of prevailing exist throughout the legal sphere. A judge can deny a motion for summary judgment under Fed. R. Civ. Pro. 26 because there is a reasonable possibility that a jury or fact-finder could find in favor of the nonmoving party without preempting the role of the jury or fact-finder. Similarly, a judge can grant a defense motion for summary judgment by finding that no reasonable fact-finder would find for the plaintiff. Fed. R. Civ. Pro. 26. Moreover, as discussed above, judicial determinations about the probability of prevailing are required in the context of a sentence six remand.

*Id.* at 19-20.

Plaintiff failed to submit these psychiatric records to the Appeals Council or District Court. (Tr. 4). Plaintiff has not described the contents of these records. (Tr. 270-74); (Pl. Brief); (Pl. Reply). The Court cannot evaluate whether omitting these records caused prejudice because the Court does not know the content of the records. Plaintiff provides a bare allegation that these records were "highly relevant to determining the nature and severity of Plaintiff's depression and Bipolar Disorder," but the Court is not required to accept this bare allegation. (Pl. Brief at 8); (Pl. Reply at 2). Plaintiff essentially asks the Court to find that the ALJ's alleged error was harmful without any evidentiary support.  (Pl. Brief); (Pl. Reply). The Court does not recommend remand on this ground.

With regard to one of these hospitalizations, in October of 2012, Plaintiff notes that the record contains "references" to this hospitalization. (Pl. Brief at 7-8). Plaintiff fails to note that the record also contains treatment notes from the

hospitalization itself. (Pl. Brief). The ALJ specifically referenced this hospitalization, and findings that he was paranoid and reporting hallucinations. (Tr. 32). This hospitalization does not support Plaintiff's claim for benefits. (Tr. 693-94). Although Plaintiff reported to other treating providers that the hospitalization occurred due to confusion with lithium dosage, he reported to emergency room staff that he allegedly accidentally overdosed on Ambien and baclofen. (Tr. 693). When questioned regarding alcohol use, providers noted that "he states he has no drank alcohol in six years; however, review of alcohol level from 3/26/11 was noted to be 346." (Tr. 693). Reports from family members also indicated more recent alcohol use. (Tr. 693). Providers also noted that "his responses to questions are somewhat vague at times and inconsistent." (Tr. 693). Examination indicated only wheezing and limited insight, and Plaintiff denied weight change, abdominal pain, arthritis, joint swelling, and hallucinations. (Tr. 694). This highlights inconsistencies in Plaintiff's claims which, as discussed below, supported the ALJ's adverse credibility finding, and contradicts his claims that he was unable to work because of pain and hallucinations. *See* SSR 96-7p.

Similarly, Plaintiff alleges that the ALJ committed harmful error because the ALJ did not explain at the hearing that free legal representation was available or determine whether Plaintiff had received the written materials as required by HALLEX. (Pl. Reply at 2). First, HALLEX is not binding when contradicted by a

statute, such as 28 U.S.C. § 2111, which requires Plaintiff to establish an error was not harmless. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842, 104 S. Ct. 2778, 2781, 81 L. Ed. 2d 694 (1984). Plaintiff has not identified what additional evidence or arguments would have been made if he had counsel present. (Pl. Brief, Pl. Reply). Consequently, Plaintiff has failed to make any allegations that would support a finding of prejudice.

Second, the record shows that Plaintiff received his notice of representation. On March 6, 2013, the Social Security Administration sent Plaintiff a Notice of Hearing that indicated he could have representation, along with an attached handout on Plaintiff's right to free representation and a Receipt of Notice to complete and return. (Tr. 100-08). Plaintiff testified that he resided at the residence to which the handout was sent. (Tr. 57. 100). Plaintiff completed the Receipt of Notice on April 1, 2013, and returned it to the Social Security Administration. (Tr. 99). If Plaintiff was able to complete the Receipt of Notice, then he received the attached handout regarding the right to representation. (Tr. 99-108). Plaintiff asserts when he left "the first hearing, he was not armed with information that may have secured him legal representation," but in fact, Plaintiff had already exercised his right to representation by hiring, then firing, an attorney. (Tr. 92). Plaintiff testified at both hearings that he understood his right to representation. (Tr. 45-46, 92-93, 96). The ALJ continued Plaintiff's first hearing and told him that if he did

not obtain counsel, they would proceed without counsel at his next hearing. (Tr. 92-93, 96). The Court does not recommend remand on this ground.

Plaintiff asserts that the ALJ failed to "explore non-exertional limitations," such as concentration, completing tasks, fatigue, isolation, side effects of medications, and work pressures. (Pl. Brief at 9). Plaintiff fails to establish that the alleged failure to elicit testimony regarding non-exertional limitations was harmful. *See* 28 U.S.C. § 2111. The ALJ acknowledged Plaintiff's claims elsewhere in the record that his pain impacted concentration, persistence, and pace, and that he used his cane in the mornings. (Tr. 27-37). Moreover, the only evidence of impaired concentration, completing tasks, fatigue, isolation, side effects, and issues with work pressure were Plaintiff's subjective claims. Doc. 11. As discussed below, the ALJ properly found that Plaintiff's subjective claims were not fully credible. *Infra.*

With regard to concentration and completing tasks, the records prior to Plaintiff's application contain no reference to impaired concentration except when Plaintiff was intoxicated, then Plaintiff reported in November of 2011 to the state agency that could not pay attention for more than "30 seconds," then he reported to ReDCO on January 23, 2012  that he had "no" impaired attention or concentration, he successfully completed tests of attention and concentration at his consultative examination the next day, and Dr. Rifai observed normal attention and concentration (Tr. 248, 576, 646, 724). With regard to isolation, treatment records

indicated that Plaintiff socialized with friends, family, and neighbors and had no problem getting along with coworkers or authority figures. (Tr. 240, 646). With regard to fatigue, Plaintiff consistently denied fatigue. (Tr. 594, 694, 698). The Court discusses below that the record contains no mention of medication side effects and multiple instances where Plaintiff explicitly denied medication side effects, including his Function Report. *Infra.*   These do not constitute post-hoc rationalizations because, as discussed below, the Court can reasonably discern from the ALJ's decision that the ALJ relied on the overall inconsistencies of Plaintiff's claims and contradictions between his claims in support of his application for benefits under the Act and his claims in treatment records. *See Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.,* 730 F.3d 291, 305 (3d Cir. 2013) (Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned").

Plaintiff asserts that the "ALJ failed to elicit from Plaintiff whether there were other sources of treatment whose records should be acquired." (Pl. Brief at 7). Again, Plaintiff fails to establish that the alleged omission of additional records caused prejudice because Plaintiff has not submitted these additional records. *See* 28 U.S.C. § 2111. Moreover, the ALJ asked Plaintiff whether there were any other treatment sources, and he testified, "no." (Tr. 56).

Finally, Plaintiff asserts that the ALJ should have obtained a report and opinion from a treating physician. (Pl. Reply at 4). Plaintiff alleges that the ALJ "failed to seek a medical opinion." (Pl. Brief at 8). Plaintiff has not submitted a report and opinion from a treating physician or identified what the opinion would say. (Pl. Brief; Pl. Reply).  Plaintiff fails to demonstrate prejudice. *See* 28 U.S.C. § 2111. Moreover, the ALJ and state agency did request that Plaintiff's treating providers offer an opinion, and they refused to do so. On March 12, 2012, the state agency sent ReDCo a request for medical records, and also asked whether ReDCo would be willing to complete an evaluation for Plaintiff's disability claim. (Tr. 555-58). ReDCo submitted medical records, but did not respond to whether they would be willing to complete an evaluation. (Tr. 555-60). On April 23, 2013, Plaintiff's treating gastroenterologists responded to a medical records request from the state agency. (Tr. 692). The gastroenterologists indicated that they would not be willing to perform an examination or test relating to Plaintiff's claim for disability. (Tr. 692). The state agency asked if Dr. Kowalyshyn would be willing to complete an evaluation in connection with Plaintiff's claim for benefits, and Dr. Kowalyshyn repeatedly responded "no." (Tr. 580, 627). The state agency asked CRNP Schock if she would be willing to complete a disability evaluation, and she did not respond. (Tr. 600). The state agency asked Dr. Hawkes if he would be willing to complete a disability evaluation, and he did not respond. (Tr. 706).

Plaintiff also fails to note that the record contains opinions from Plaintiff's psychiatrists which support the denial of benefits. (Pl. Brief); (Pl. Reply). The Regulations provide a "broad definition" of medical opinion. *See Wrights v. Colvin*, No. 3:13-CV-02516-GBC, 2015 WL 2344948, at *10 (M.D. Pa. May 14, 2015) (citing 20 C.F.R. §1527(a)(2) ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.")). Here, ReDCO psychiatrists opined that Plaintiff's GAF was no lower than 55.[2]  GAF scores are more probative of non-disability than disability. This is because:

> The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. The score is useful in planning treatment and predicting outcomes. *Id.* The GAF rating is the single value that best reflects the individual's overall functioning at the time

---

[2] *Schwartz v. Colvin*, 3:12-CV-01070, 2014 WL 257846 at *5, n. 15 (M.D. Pa. Jan. 23, 2014) ("The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness… A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning.. A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships") (citing *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed.1994).

> of examination. The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if *either* the symptom severity *or* the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the *worse* of the two.

*Schwartz v. Colvin*, 3:12-CV-01070, 2014 WL 257846 at *5, n. 15 (M.D. Pa. Jan. 23, 2014). Thus, a GAF score of 55 indicates that neither the claimant's functional impairment nor symptoms are more than moderate. *Id.*   The Court does not recommend remand on this ground.

## B. Obesity

Like development of the record, a claimant alleging an error at step two must show it was harmful. At step two, the ALJ first considers whether there are any medically determinable impairments and then determines whether any of the medically determinable impairments are "severe." 20 C.F.R. § 404.1529. Determining whether a claimant has any medically determinable, severe impairments is a threshold test. *See* 20 C.F.R. § 404.1520(c). If a claimant has any severe impairments, the evaluation process continues. *See* 20 C.F.R. § 404.1520(d)-(g). Thus, an error at step two will be harmless unless the claimant identifies an error in assessing the impairment at subsequent steps. *See Rutherford v. Barnhart,* 399 F.3d 546, 552–53 (3d Cir.2005) (Remand is not appropriate where ALJ's error does not affect the ultimate outcome); 28 U.S.C.A. § 2111 ("[T]he court shall give judgment after an examination of the record without regard

to errors or defects which do not affect the substantial rights of the parties."). For instance, in *Rutherford*, the Court held that any error in evaluating the claimant's obesity was harmless because:

> [Claimant] has not specified how that factor would affect the five-step analysis undertaken by the ALJ, beyond an assertion that her weight makes it more difficult for her to stand, walk and manipulate her hands and fingers. That generalized response is not enough to require a remand.

*Rutherford*, 399 F.3d at 553. Plaintiff acknowledges that he must demonstrate that "the ALJ's error at step two also influenced the ALJ's RFC analysis." (Pl. Reply at 5) (quoting *McClease v. Commissioner of Soc. Sec.*, 2009 WL 3497775, at *10 (E.D. Pa. 2009)).

Plaintiff asserts that remand is required because "close scrutiny" is required when there is a "denial of benefits" at step two. (Pl. Brief at 14) (citing *McCrea v. Commissioner of Social Security*, 370 F.2d 357 (3d Cir. 2004); *Newell v. Commissioner of Social Security*, 347 F.3d 541 (3d Cir. 2003). In those cases, the analysis did not proceed beyond step two because there were no severe impairments. *Id.* Plaintiff asserts that these facts were "mere happenstance," and that *McCrea* and *Newell* should apply even when at least one severe impairment is found. (Pl. Brief at 14). However, close scrutiny is only required when there is a denial of benefits at step two. *Id.* Denial of benefits at step two only occurs when there are no severe impairments. *See* 20 C.F.R. § 404.1520(d)-(g). Consequently,

the fact that there were no severe impairments in *McCrea* and *Newell* was the only reason that close scrutiny was required; this fact was the crux of those cases. *McCrea*, 370 F.2d at 357; *Newell*, 347 F.3d at 541.

In contrast, *Rutherford* directly addresses how to evaluate errors at step two when at least one impairment is severe. *Rutherford*, 399 F.3d at 553. The Court will not rely on *McCrea* or *Newell*, dicta as applied to this case, when there is relevant binding precedent. *See Burns v. Colvin*, No. 1:14-CV-1925, 2016 WL 147269, at *1 (M.D. Pa. Jan. 13, 2016) (citing *Kool, Mann, Coffee & Co. v. Coffey,* 300 F.3d 340, 355 (3d Cir.2002) (Statements that are "not necessary to the actual holding of the case" are "dicta" and "not binding"); *Calhoun v. Yamaha Motor Corp.,* 216 F.3d 338, 344 n. 9 (3d Cir.2000) ("Insofar as this determination was not necessary to either court's ultimate holding, however, it properly is classified as dictum. It therefore does not possess a binding effect on us pursuant to the 'law of the case' doctrine."); *Chowdhury v. Reading Hosp. & Med. Ctr.,* 677 F.2d 317, 324 (3d Cir.1982) ("[D]ictum, unlike holding, does not have the strength of a decision 'forged from actual experience by the hammer and anvil of litigation,' a fact to be considered when assessing its utility in the context of an actual controversy. Similarly, appellate courts must be cautious to avoid promulgating unnecessarily broad rules of law.") (quotations omitted).

Here, Plaintiff alleges only that the ALJ's error "tainted the ALJ's analysis at the subsequent steps of the sequential evaluation," that obesity "may" cause more pain and limitation on a weight-bearing joint, and that Plaintiff testified to pain and limitations in lifting, carrying, and standing. (Pl. Reply at 6) (citing SSR 02-1p; Tr. 59). This is a generalized response and, pursuant to *Rutherford*, "is not enough to require a remand." *Rutherford*, 399 F.3d at 553.

Plaintiff cites cases from another District to argue that if an impairment "may" have an impact on the RFC, the Court should remand. (Pl. Reply at 6) (quoting *Jennings v. Astrue*, 2009 WL 7387721 at *16 (E.D. Pa. 2009)). However, this Court is bound by *Rutherford*, not *Jennings*, and the Third Circuit in *Rutherford* required more than a "generalized response" to establish harmless error and remand. *Rutherford*, 399 F.3d at 553.

Plaintiff notes that "defendant fails to point to a single element of the ALJ's RFC finding that reflects additional limitations attributable to his obesity." (Pl. Reply at 5). Defendant does not bear the burden to identify which elements of the RFC finding reflect Plaintiff's obesity. Plaintiff bears the burden to identify additional limitations that were not incorporated into the RFC finding, and demonstrate that the ALJ's omission of the additional limitations lacked substantial evidence. *See Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003).  Plaintiff submitted objective evidence of his impairment of obesity, but the only evidence of

additional limitations were his subjective claims and Dr. Muthiah's opinion. Doc. 11. As discussed below, the ALJ properly found that Plaintiff's subjective claims were not fully credible and properly relied on Dr. Hutz's opinion over Dr. Muthiah's opinion. *Infra*. Given that Plaintiff has failed to identify specific additional limitations that should have been in the RFC, and substantial evidence supports the ALJ's credibility analysis, the Court would not direct a verdict in Plaintiff's favor if the question of whether the ALJ sufficiently accommodated Plaintiff's obesity was before a jury. *See Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003).

## C. Medical Opinions

Plaintiff asserts that the ALJ erred in crediting Dr. Hutz's non-treating opinion over Dr. Muthiah's non-treating opinion. Plaintiff asserts that the Regulations bestow deference on non-treating medical opinions because the Regulations require the ALJ to "evaluate" all medical opinions. (Pl. Reply at 7) (citing 20 C.F.R. §416.927(c)). A requirement to evaluate a medical opinion does not equate to a requirement to defer to a medical opinion. In contrast, the Regulations and case law specifically bestow "special deference" on treating source medical opinions. Standards for Consultative Examinations and Existing Medical Evidence, 56 FR 36932-01 at *36936 ("as long as the treating source is someone entitled to special deference, and all other factors are equal, we will

always give more weight to treating source medical opinions than to opinions from other sources"); *see also Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) ("A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.""). In the absence of any legal authority bestowing deference on non-treating source medical opinions, the Court evaluates the ALJ's assignment of weight to non-treating source medical opinions under the general substantial evidence standard.

The ALJ specifically addressed Dr. Muthiah's sitting limitation, writing that:

> However, the undersigned disagrees with the limitation to sitting for three hours since this is not supported by the physical evaluation findings of multiple physicians including the claimant's treating physician Dr. Hawks and, indeed, the consultative evaluator's own physical evaluation that shows decreased range of motion with normal strength and a normal neurological evaluation (Exhibit 6F).

(Tr. 33). The ALJ's explanation that Dr. Muthiah's opinion was not supported by the examination findings or clinical findings by treating providers is sufficiently specific to determine whether substantial evidence supports his assignment of weight to Dr. Muthiah's opinion. *See Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.,* 730 F.3d 291, 305 (3d Cir. 2013) (Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned"); *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (ALJ is not

required to "use particular language or adhere to a particular format in conducting his analysis" and instead must only "ensure that there is sufficient development of the record and explanation of findings to permit meaningful review.").

Plaintiff asserts that the ALJ impermissibly used lay reinterpretation of the evidence to supplant the non-treating source medical opinion. The prohibition on lay reinterpretation of the evidence was retained by Regulations enacted in 1991 with regard to treating sources. *See* 20 C.F.R. §404.1527(c)(2); *Tilton v. Colvin*, No. 1:14-CV-02219-YK-GBC, 2016 WL 1580003, at *5 (M.D. Pa. Mar. 31, 2016), *report and recommendation adopted,* No. 1:14-CV-2219, 2016 WL 1569895 (M.D. Pa. Apr. 19, 2016) (citing *Burns v. Colvin,* No. 1:14–CV–1925, 2016 WL 147269 (M.D. Pa. Jan. 13, 2016) (citing *United States v. Texas,* 507 U.S. 529, 534, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993); *Sebelius v. Cloer,* ___ U.S. ____, 133 S.Ct. 1886, 1896, 185 L.Ed.2d 1003 (2013); *Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 253–254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992); *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 543, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994)).

However, Section 404.1527 abrogated these cases with regard to non-treating sources. When regulatory language "speak[s] directly" to an issue, and is not "compatible with preexisting practice," the regulation abrogates common-law. *Sebelius v. Cloer,* ——U.S. ——, 133 S.Ct. 1886, 1896, 185 L.Ed.2d 1003 (2013)

(internal citations omitted); *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 543, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) (internal citations omitted). The Regulations provide that ALJs are "not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists." 20 C.F.R. § 404.1527(e)(2)(i). Prior cases held that the ALJ was bound by any uncontradicted medical opinions, even from non-treating sources. *See Frankenfield v. Bowen,* 861 F.2d 405, 408 (3d Cir. 1988); *Doak v. Heckler,* 790 F.2d 26, 29–30 (3d Cir. 1986); *Ferguson v. Schweiker,* 765 F.2d 31, 37, 36–37 (3d Cir. 1985); *Kent v. Schweiker,* 710 F.2d 110, 115 (3d Cir. 1983); *Van Horn v. Schweiker,* 717 F.2d 871, 874 (3d Cir. 1983); *Kelly v. R.R. Ret. Bd.,* 625 F.2d 486, 494 (3d Cir. 1980); *Rossi v. Califano,* 602 F.2d 55, 58–59, (3d Cir. 1979); *Fowler v. Califano,* 596 F.2d 600, 603 (3d Cir. 1979); *Gober v. Matthews,* 574 F.2d 772, 777 (3d Cir. 1978). Consequently, 20 C.F.R. §404.1527(e)(2)(i) speaks directly to this issue, is incompatible with the prior law, and abrogates the prior cases with regard to non-treating opinions. An ALJ is no longer prohibited from reinterpreting medical evidence to supplant the opinion of a non-treating source. *See* 20 C.F.R. §404.1527(e)(2)(i).

Regardless, the ALJ was not required to undertake lay reinterpretation of medical evidence to evaluate Dr. Muthiah's opinion. Dr. Hutz reviewed the record, including Dr. Muthiah's opinion, and indicated that Dr. Muthiah overly relied on

subjective complaints rather than objective findings and was inconsistent with the

treatment record. (Tr. 117-24). The ALJ relied on Dr. Hutz's opinion. (Tr. 35). The

Court can reasonably discern that the ALJ relied on Dr. Hutz's expert opinion of

the medical evidence, including Dr. Muthiah's opinion, and did not rely solely on

lay reinterpretation of medical evidence. *See Christ the King Manor, Inc. v. Sec'y*

*U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 305 (3d Cir. 2013) (internal

quotations omitted).

### D. Credibility

When making a credibility finding, "the adjudicator must consider whether

there is an underlying medically determinable physical or mental

impairment(s)…that could reasonably be expected to produce the individual's pain

or other symptoms." SSR 96-7P. Then:

> [T]he adjudicator must evaluate the intensity, persistence, and limiting
> effects of the individual's symptoms to determine the extent to which
> the symptoms limit the individual's ability to do basic work activities.
> For this purpose, whenever the individual's statements about the
> intensity, persistence, or functionally limiting effects of pain or other
> symptoms are not substantiated by objective medical evidence, the
> adjudicator must make a finding on the credibility of the individual's
> statements based on a consideration of the entire case record.

SSR 96-7P; *see also* 20 C.F.R. § 416.929. The Third Circuit explained in *Mason v.*

*Shalala*, 994 F.2d 1058 (3d Cir. 1993):

> An ALJ must give serious consideration to a claimant's subjective
> complaints of pain, even where those complaints are not supported by
> objective evidence. *Ferguson v. Schweiker,* 765 F.2d 31, 37 (3d

> Cir.1985). "While there must be objective evidence of some condition that could reasonably produce pain, there need not be objective evidence of the pain itself." *Green,* 749 F.2d at 1071. Where medical evidence does support a claimant's complaints of pain, the complaints should then be given "great weight" and may not be disregarded unless there exists contrary medical evidence. *Carter,* 834 F.2d at 65; *Ferguson,* 765 F.2d at 37.

*Id.* at 1067-68. Plaintiff's underlying impairments were corroborated by objective medical evidence, but not his complaints. His subjective claims were entitled to "serious consideration," but not great weight. *Mason*, 994 F.2d at 1067.

Plaintiff asserts that the ALJ erred in failing to explicitly mention how he evaluated two factors relevant to credibility: medication usage and explanation for conservative treatment. (Pl. Brief at 9). Similarly, Plaintiff asserts that the ALJ "fail[ed] to consider" testing that showed liver and spine abnormalities. (Pl. Brief at 15). The Regulations require the ALJ to "consider" these factors. 20 C.F.R. §404.1529. However, "there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision." SSR 06–3p. *See also Phillips v. Barnhart,* 91 Fed.Appx. 775, 780 (3d Cir.2004) ("the ALJ's mere failure to cite specific evidence does not establish that the ALJ failed to consider it") (quoting *Black v. Apfel,* 143 F.3d 383, 386 (8th Cir.1998)). In other words, the word "consider" has been construed by the Commissioner and courts to not require citation or written explanation. *Id.* Thus, an ALJ does not need to cite each factor considered in the analysis. *See Francis v.*

*Comm'r Soc. Sec. Admin.,* 414 Fed.Appx. 802, 804–05 (6th Cir.2011) ("Although the regulations instruct an ALJ to consider these factors," they do not require "an exhaustive factor-by-factor analysis.").

The ALJ noted that Plaintiff primarily received treatment from a primary care physician. (Tr. 32). As discussed above, the ALJ's failure to cite Plaintiff's explanation for failing to treat with specialists does not mean the ALJ failed to consider this explanation. *Supra.* Moreover, while the ALJ must consider Plaintiff's explanation, the ALJ is not required to accept Plaintiff's explanation.[3]

---

[3] The ALJ was not required to accept this explanation as inherently true. In the Social Security cases before the undersigned where the claimant had an Access Card, claimants are able to follow with specialists, including pain management specialists. *Buckner v. Colvin*, No. 1:15-CV-00175-YK-GBC, 2016 WL 1621993, at *8 (M.D. Pa. Mar. 30, 2016), *report and recommendation adopted*, No. 1:15-CV-175, 2016 WL 1595346 (M.D. Pa. Apr. 21, 2016) (Claimant with medical assistance card was able to treat with neurologists); *Treadway v. Colvin*, No. 3:14-CV-01697-GBC, 2015 WL 5934259 (M.D. Pa. Oct. 7, 2015) (Claimant with Access Card received treatment from mental health specialists); *Gartland v. Colvin*, No. 3:13-CV-02668-GBC, 2015 WL 5695311, at *6 (M.D. Pa. Sept. 28, 2015) (Claimant was able to see a rehabilitation orthopedist, an otorhinolaryngologist, and a mental health specialist with a medical access card); *Jones v. Colvin*, No. 1:13-CV-02161-GBC, 2014 WL 4796491, at *8 (M.D. Pa. Sept. 26, 2014) (Claimant with Access card received treatment from pain management and mental health specialists); *Wilson v. Colvin*, No. 3:13-CV-02401-GBC, 2014 WL 4105288, at *11 (M.D. Pa. Aug. 19, 2014) (Claimant testified that she would have been able to see a neurologist if she had not lost her Access Card, and was able to see a rheumatologist, an orthopedist, a neurologist, and a pain management specialist once she regained her Access Card); *Wilson v. Colvin*, No. 3:13-CV-02401-GBC, 2014 WL 4105288, at *11 (M.D. Pa. Aug. 19, 2014) (Claimant with Access Card was able to treat with an endocrinologist). However, rather than take judicial notice of the cases, the undersigned relies on Plaintiff's burden of production, and his failure to produce any evidence other than his

The ALJ noted that Plaintiff saw other specialists, such as a psychiatrist and gastroenterologist. (Tr. 33). Plaintiff asserts that his medication usage supports his claim because his primary care physicians consistently prescribed opiates. (Pl. Reply at 9). Aside from heroin, there is no evidence of opiate use before Plaintiff's December 2011 consultative examination. (Tr. 553). Plaintiff's primary care physicians prescribed opiates reluctantly, at best, and Plaintiff switched primary care physicians when Dr. Kowalyshyn refused to continue prescribing opiates. (Tr. 582-85, 601-09, 708-14).

Even if the ALJ had erred in considering Plaintiff's medication and treatment, "whether the error is harmless depends on whether the other reasons cited by the ALJ in support of [the] credibility determination provide substantial evidence for her decision." *Brumbaugh v. Colvin,* 3:14–CV–888, 2014 WL 5325346, at *16 (M.D.Pa. Oct. 20, 2014). The ALJ also explained that "physical evaluations are relatively normal," he "reported good control of his asthma," mental status evaluations were "relatively normal," he was assessed a GAF of 55, the record was "scant" with regard to Plaintiff's "very old date last insured [of] June 30, 2006," and Dr. Hutz's opinion supported the RFC and was "mostly consistent with the objective findings." (Tr. 32-35). Plaintiff does not address the lack of objective medical evidence on examination, lack of records regarding his

_____

subjective claims that he was unable to see a specialist because they would not take his insurance. *See* 42 U.S.C. § 423(d)(5)(A).

date last insured, or Dr. Hutz's opinion. (Pl. Brief); (Pl. Reply). If any reasonable person would resolve the conflict in medical opinions in favor of Dr. Hutz, not Dr. Muthiah, substantial evidence supports the ALJ's reliance on Dr. Hutz. *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003).

Plaintiff asserts that the Court should not rely on Defendant's assertions because they violate the *Chenery* doctrine. (Pl. Reply 9) (citing *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 87, 63 S. Ct. 454, 459, 87 L. Ed. 626 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based"). However, although the Court may not affirm based on "post-hoc rationalizations," Courts have a "responsibility to uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."*Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 305 (3d Cir. 2013) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 2867, 77 L. Ed. 2d 443 (1983); *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)).

The ALJ is entitled to deference with regard to credibility determinations. *See  Szallar v. Comm'r Soc. Sec.*, No. 15-1776, 2015 WL 7445399, at *1 (3d Cir. Nov. 24, 2015) ("the ALJ's assessment of his credibility is entitled to our

substantial deference") (citing *Zirnsak v. Colvin*, 777 F.3d 607, 612–13 (3d Cir.2014)). Moreover, "[n]either the district court nor this court is empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (citing *Early v. Heckler*, 743 F.2d 1002, 1007 (3d Cir.1984)). The Court does not recommend remand on these grounds.

## VII.    Conclusion

The Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Brown*, 845 F.2d at 1213; *Johnson*, 529 F.3d at 200; *Pierce*, 487 U.S. at 552; *Hartranft*, 181 F.3d at 360; *Plummer*, 186 F.3d at 427; *Jones*, 364 F.3d at 503. Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). "Stated differently, this standard is met if there is sufficient evidence 'to justify, if the trial were to a jury, a refusal to direct a verdict.'" *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456

(1951)).  Here, a reasonable mind might accept the relevant evidence as adequate.

The Court would not direct a verdict in Plaintiff's favor if the issues were before a

jury.   Accordingly, it is HEREBY RECOMMENDED:

I.      This appeal be DENIED, as the ALJ's decision is supported by
        substantial evidence; and

II.     The Clerk of Court close this case.


The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings,
recommendations or report addressing a motion or matter described in
28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the
disposition of a prisoner case or a habeas corpus petition within
fourteen (14) days after being served with a copy thereof. Such party
shall file with the clerk of court, and serve on the Magistrate Judge
and all parties, written objections which shall specifically identify the
portions of the proposed findings, recommendations or report to
which objection is made and the basis for such objections. The
briefing requirements set forth in Local Rule 72.2 shall apply. A
Judge shall make a de novo determination of those portions of the
report or specified proposed findings or recommendations to which
objection is made and may accept, reject, or modify, in whole or in
part, the findings or recommendations made by the magistrate judge.
The Judge, however, need conduct a new hearing only in his or her
discretion or where required by law, and may consider the record
developed before the magistrate judge, making his or her own
determination on the basis of that record. The Judge may also receive
further evidence, recall witnesses or recommit the matter to the
Magistrate Judge with instructions.


Dated: August 25, 2016                   _____s/Gerald B. Cohn_____
                                         GERALD B. COHN
                                         UNITED STATES MAGISTRATE JUDGE